## TERRITORY OF HAWAII *v.* WATANABE MASAGI and FUNAKOSHI TATSUGORO.

EXCEPTIONS FROM CIRCUIT COURT, FOURTH CIRCUIT.

ARGUED OCTOBER 10, 1904.    DECIDED NOVEMBER 7, 1904.

FREAR, C.J., HARTWELL AND HATCH, JJ.

BILL OF EXCEPTIONS—*practice.*

The practice of referring to papers filed in a case as part of a bill of exceptions instead of incorporating in the bill copies of papers relied upon is objectionable.

ABSENCE OR DISAPPEARANCE—*of papers referred to in the bill of exceptions.*

The court can not pass upon exceptions not presented by the papers in the case. If papers relied upon which were on the files are not there, the defendants' attorneys, on discovering their absence, should apply to the trial court to replace them. A new trial is not granted on a bill of exceptions on the ground of absence of papers relied on in the bill.

TRANSCRIPT OF PROCEEDINGS—*discrepancies from same in bill of exceptions.*

The bill of exceptions making the transcript part of itself, a discrepancy between the two may properly be resolved in favor of the correctness of the transcript, which was made from stenographer's notes taken at the time.

SEPARATE TRIALS—*for joint offense.*

It was discretionary with the court whether to order a separate trial of the two defendants charged with the murder of one M. K. The evidence does not show that a joint trial was prejudicial to either defendant, following *The King v. Paakaula,* 3 Haw. 30; *Rex v. Tin Ah Chin, Ib.* 90.

EXHIBITS PRESENTED IN TRIAL COURT—*not required with bill of exceptions.*

It is neither requisite nor proper to present for the consideration of the exceptions in this case the exhibits, such as swords, kimonos, etc., which were filed in the trial court.

EVIDENCE—*former offenses.*

It is not error to admit evidence of facts showing motive, or which are part of the transaction, or exhibit a train of circumstantial evidence of guilt, although such facts showed former offenses of the defendants.

WITNESS—*cross-examination for the purpose of impeaching—expert.*

It is not error to disallow on cross-examination a question asked for the purpose of laying a basis to impeach the witness on an immaterial matter.

It was not an abuse of discretion by the court to allow a trained chemist to testify of his analysis of charred cloth, in which he found, as he said, that there had been blood, whether human or not, he could not say.

VIEW OF PREMISES—*by jury.*

The question of the legality of a view of premises by the jury and of statements there made by the sheriff and deputy sheriff to the jurors in answer to their questions concerning the condition of things as they first found them there is not presented by any of the exceptions in this case, a view in criminal cases said, however, to have been the practice in Hawaii as at common law.

EXPERT—*hypothetical question.*

It was proper for the court to ask a medical expert whether an ordinary man in inflicting upon himself a wound (described in the question as in the evidence) would be most likely to use his right hand or his left hand.

It is erroneous to allow hypothetical questions unwarranted by any testimony in the case. A question to a medical expert was properly ruled out which required him to say on the hypothesis named to him "whether or not that wound could have been inflicted by the man himself," the facts assumed being of a nature not calling for an expert opinion.

VERDICT—*sustained by evidence—the court does not pass upon the possibility of doubt.*

>The evidence in this case fully sustains the verdict of manslaughter which was rendered.

>Because of evidence on which doubt of guilt might be based, the court can not say that such doubt ought to have been produced in the minds of the jury.

SENTENCE—*general exception to, without stating ground for the exception.*

>A general exception to a sentence, stating no grounds for the exception, does not present a question of law upon the legality of the court pronouncing sentence without first asking defendants if they had anything to say why sentence should not be pronounced.

OPINION OF THE COURT BY HARTWELL, J.

The defendants were tried at the January Term, 1903, of the Fourth Circuit Court held at Hilo, Island of Hawaii, Little J., presiding, upon an indictment charging them with the murder of one Motohiro Kitaro, January 25, 1902. The indictment charged murder in the first degree. The jury rendered a verdict finding the defendants guilty of murder in the second degree. The court sentenced the defendant Funakoshi Tatsutaro to imprisonment at hard labor for thirty years and the defendant Watanabe Masagi to imprisonment at hard labor for twenty-five years.

The bill of exceptions, following the practice which has long prevailed here, although unauthorized in many other jurisdictions, does not incorporate in itself copies of the pleadings, motions, instructions and exhibits filed in the trial court, and intended to be relied on, but refers to those papers and recites that "said defendants hereby refer to, incorporate herein and make a part of this bill of exceptions all records, papers, files, affidavits, exhibits, testimony, stenographer's notes, stenographer's transcripts and other papers and documents in said cause the same as if they and each of them were actually set out herein in words and figures;" and prays that the bill of exceptions be allowed, and that the above mentioned records and other papers

"be expressly made a part of this bill of exceptions and incorporated herein as fully and completely as if they and each of them were actually set out herein in words and figures."

The trial judge allowed the bill of exceptions, ordering that the records and papers above mentioned, and specifically mentioned in the order, be "made a part of said bill of exceptions and incorporated therein as fully and completely as if they and each of them were actually set out therein in words and figures."

The practice is open to serious objections which are evident in this case, in which it appears that several of the papers above mentioned are not now before us. The plaintiff claims that the following papers are missing, namely: Two motions to quash the indictment, motion for separate trial of Watanabe, motion for continuance of trial, challenge to array of trial jury, instructions to the jury; Exhibit "A," being map or plan which was used in evidence, also the following additional exhibits, viz.: "B" and "C," swords; "D," "E," kimonos; "F," piece of cloth; "G," "K," pants; "I," shirt; "J," knife. Copies, however, are now filed of the motions for separate trial and continuance and their accompanying affidavits, sworn to by one of the attorneys of the defendants at the trial. The transcript of the evidence and proceedings states that the defendants were arraigned January 14, 1903; that the indictment was read and translated to them; that the case was set for trial on Monday, the 19th, at 10 o'clock, the plea to be heard at 9 o'clock; that on Thursday, January 15th, the time to plead was set for 1:30 p. m. of "Friday the 17th," (that day being the 16th). The transcript thereupon reads as follows:

"Friday P. M., January 16th, 1903.

MR. ROSS. In this case we have filed a motion to quash the indictment.

Both defendants present in court.

Mr. Ross reads the motion.

THE COURT. Motion overruled.

MR. ROSS. We note exception on this.

THE COURT. No.

MR. ROSS. Your honor certainly will allow us an exception.

THE COURT.    Well, exception allowed.

THE COURT.    Are you ready to plead?

MR. ROSS.    Yes, sir."

The record of the clerk of the Fourth Circuit Court, a certified copy of which is before us, does not state that the motion was filed, but reads: "A motion by the attys. for the defense to quash was denied by the Court, and the defendants entered a plea, not guilty."

The transcript on the subject of the second motion to quash, and also on the motions for separate trials and continuance, reads as follows:

"Monday, A. M., January 19th, 1903.

MR. W. H. SMITH.    We desire to withdraw the plea made the other day in order that we may make a motion.

D. ATTORNEY GENERAL.    We will object. Not timely and that they had already entered a plea of not guilty thus putting themselves upon the country for trial.

THE COURT.    Let me know what the motion is.

MR. W. H. SMITH.    The motion we would desire to file subsequent to the withdrawing of the plea, if we be allowed to do so, would be a motion to quash on the three grounds presented the other day and another ground, that the grand jury which drew the indictment was not drawn in accordance with law and therefore the indictment is null and void.

THE COURT.    Motion overruled.

MR. LE BLOND.    We would like an exception to the overruling of the motion.

THE COURT.    Exception allowed.

11:00 A. M., Monday, January 19th, 1903.

Mr. Le Blond presents motion for separate trial of Watanabe Masagi, together with affidavit of Watanabe Masagi.

Argument.

DEPUTY ATTORNEY GENERAL.    No time to file counter affidavits; affidavits presented at 10 o'clock.

THE COURT.    Be ready for trial at 1:30 without fail.

Argument by Deputy Attorney General.

Session suspended until 1:30 P. M.

Afternoon session opened at 1:30.

Argument by Deputy Attorney General continued.

Argument by Mr. Le Blond.

THE COURT.   Overrule motion for severance.   Proceed on the trial of both of them.

MR. LE BLOND.   Will the court allow us an exception?

THE COURT.   Allow the exception.

MR. ROSS.   If the court please, in the case now on trial we have filed a challenge to the array of the jury; also have served copy on the prosecution.

Mr. Ross reads affidavit of C. M. Le Blond attached to challenge.

MR. ROSS.   I would like to make the change from grand jury to trial with the consent of the affiant before the notary.

THE COURT.   Make the change.

THE COURT.   Challenge overruled on the ground the venires speak for themselves.   I decline to hear any evidence in the matter whatever, for the same reason that the record speaks for itself.

MR. ROSS.   Exception to the ruling of the Court in refusing to permit us to introduce evidence at this time and also to the ruling of the court on the challenge.

The defense moves for continuance of trial on account of absence of material witnesses, eighteen miles away, and the court overrules the motion, which is on file, on the ground of sufficient time allowed to get the witness here.

MR. LE BLOND.   We note exception.

THE COURT.   Exception allowed.

THE COURT.   Call the jury to try the case.

Jury sworn to try the case."

The clerk's record fails to mention the filing of motions for separate trials, of challenge to the array, or continuance, reading as follows:

"Le Blond and Smith & Wise and Ross, Att'ys for defendants 11:30 A. M.

"A motion, that the defendants have a separate trial was argued.   Suspended till 1:30 P. M.   At 1:30 P. M. the court meets and counsel for the defense challenges the array of jurors. The court overrules the motion to challenge and to hear evidence, and a motion for continuance was denied, to which exceptions were noted."

Neither the transcript nor the clerk's record mentions the presentation or filing of any request for instructions on the part of the defendants, or prosecuting attorney, nor is any mention

made therein that the instructions to the jury given by the court were reduced to writing. The transcript shows that upon the rendition of the verdict of murder in the second degree, Thursday evening, January 22, the following occurred:

"MR. Ross. (Atty. for defendants.) I object to the verdict as being contrary to the law and the evidence and the weight of the evidence, and give notice of motion for a new trial." (P. 271.)

And further, that on January 28, 1903, leave was granted to amend by interlineation the defendants' motion for new trial, which, as amended, was "presented by the defendants." (P. 272.) The clerk's record, on the subject of motion for new trial, states that it was argued, but neither the record nor transcript mentions that the motion was filed.

It is apparent from the transcript that the second motion to quash the indictment on the three grounds presented in the first motion, and also on the further ground that the jury was not drawn in accordance with law, was not filed, the defendants having pleaded and the court declining to allow their pleas to be withdrawn; nor does it appear from the record that either the motion for separate trial of Watanabe, together with his affidavit, or a motion for a new trial, was filed, although a sworn copy of the former motion with affidavit is filed herein. On the subject of instructions and motions for a new trial the bill of exceptions reads as follows:

### "FIFTY-FOURTH EXCEPTION.

"Thereafter both the Territory and the defendants having rested and argument having been made to the jury by the respective counsel, the court proceeded to charge the jury, and the said instructions of the court so given to the jury are hereby made a part of this exception as though the same had been fully set out herein, and the exceptions taken to the said instructions and the refusal of the court to give the instructions asked by the defendants are here and now assigned as error by said defendants."

### "FIFTY-FIFTH EXCEPTION.

"And be it further remembered that after said court had charged said jury the said jury retired to consider their verdict, and returned into court the following verdict:

"Circuit Court of the Fourth Circuit, Territory of Hawaii.
Territory of Hawaii,
   vs.
Watanabe Masagi &
Funakoshi Tatsugoro.

We the jury in the above entitled cause, find the defendants.
guilty of murder in the second degree.

A. B. Lobenstein,<br>Foreman."

"And thereupon the said defendants excepted to said verdict
as being contrary to law and the evidence, and to the weight of
the evidence, and gave notice of motion for a new trial." Stenographer's notes p. 271.

"And thereafter and within due and proper time said defendants moved said court to vacate, set aside and annul said verdict.

"Said motion was made upon the grounds and for the reasons
contained in the written motion for a new trial in said cause
filed, which said motion for a new trial is hereby expressly
referred to, made a part of this bill of exceptions and incorporated herein, as fully as if the same were completely set out.

"Said motion having been argued and submitted to said court.
for decision, said court denied the same and the whole thereof,
to which said ruling of said court said defendants then and
there duly excepted, and said defendants here and now assign
said ruling of said court as error." Stenographer's notes, p. 272.

Before the bill of exceptions was prepared, the clerk of the
circuit at the request of the defendants' attorney transmitted the
papers filed in the case to the clerk of this court. Precisely
what papers were transmitted does not appear, no list of them
having accompanied the letter of transmittal. Such a list ought
always to accompany a letter transmitting court papers. It
appears that Mr. Bitting, as attorney of the defendants, caused
whatever papers were sent here to be sent back to the clerk of
the Circuit Court at Hilo for use in a petition for *habeas corpus*
brought by him in behalf of the defendants, and that upon the
failure of that application, the papers, again with no accompanying list or description, were returned by the clerk of the
Circuit Court to the clerk of this court. The transcript of the
proceedings was, by leave of the Chief Justice, taken from the

files here by Mr. Cathcart, one of the attorneys who presents this bill of exceptions, for the purpose of preparing his brief. For a considerable time this transcript was missing, but finally was produced by Mr. Davis, the other attorney for the defendants, from his office, he stating that he had placed it for safe keeping under lock and key, but had forgotten the fact or the place of its deposit. The attorneys who appeared for the defendants at the trial do not represent them in this court.

Under the circumstances, the discrepancy between the transcript, which by the bill is expressly made a part thereof, and the bill, in respect of the failure of the former to show the filing of certain papers which the latter avers have been filed, may properly be resolved in favor of the correctness of the transcript, which was made from stenographer's notes taken at the time, and more particularly so when the transcript conforms to the clerk's record upon the subject.

The absence from the record of the second motion to quash the indictment, including the challenge to the array, as well as of written instructions requested by the defendants, or given to the jury, and of the defendants' motion for a new trial, does not authorize the inference that those papers were ever in the files of the court. Mr. Cathcart informs the court that he thinks they were there at the time that he prepared the bill of exceptions, but he cannot positively say that they were. It is impossible to say what has become of the papers which were clearly once filed in the case and are not now on the files. Attorneys, in examining the papers of the court during the conduct of a case, may often get them mixed up with their private papers and then mislay or lose them. It is therefore desirable in important cases in the future that counsel, in preparing a bill of exceptions, adopt the practice elsewhere common, and frequently prescribed by rules of court, of incorporating in the bill copies of such papers as they rely upon.

The motion of the defendant Watanabe for a separate trial is based on his affidavit setting forth that the preliminary examinations of the defendants were separate; that the evidence then

presented against this defendant differed from that presented against the other defendant and was contrary to it; that the defendants had different defenses; and that the evidence against the other defendant would be incompetent against this one, and would prejudice and injure him; that in a joint trial this defendant would be prejudiced in his right to challenge, and could not have a fair and impartial trial.

We see no error in the denial of this motion; ordering of a separate trial in such cases being a matter within the discretion of the court, and the evidence in the case does not show that a joint trial was prejudicial to either defendant. *The King v. Paakaula,* 3 Haw. 30; *Rex v. Tin Ah Chin,* 3 Ib. 90.

The motion for continuance is based upon the affidavit of the attorney, Mr. W. H. Smith, alleging that one Mrs. Nakamura, a material witness for the defense, who had been subpœnæd, resided at a distance of eighteen miles in Olaa, and if present, would testify to facts showing an alibi. The denial of this motion on the ground that there was sufficient time to get the witness was not error. It does not appear that there was not ample time to obtain the witness.

Upon the present showing the first motion to quash the indictment is the only paper not before us which is referred to in the bill as filed in the trial court, and also is shown either by the transcript or clerk's records to have been filed. The grounds of that motion are not set forth in the bill, and do not appear elsewhere. Error can not be inferred from the mere denial of the motion; nor can it be based upon grounds not stated.

The same is true of the instructions given, but which are not shown.

The defendants, however, claim that error appears in the record from the fact that it does not contain the instructions or show that there was a written consent that the court should charge the jury orally. The case cited to sustain this claim is *Hopt v. Utah,* 114 U. S. 488, which was a writ of error to reverse a judgment in the Supreme Court of Utah which affirmed upon appeal from

a district court of Utah a judgment and sentence of death upon conviction of murder.

The statute of Utah required, as does that of Hawaii, that the charge to the jury "be reduced to writing before it is given, unless by mutual consent of the parties it is given orally." The statute further required that "within five days after judgment upon a conviction the clerk must annex together and file the papers necessary to constitute the record, including '4. A copy of the minutes of trial; 5. A copy of the minutes of the judgment; 6. The bill of exceptions, if there be one; 7. The written charges asked of the court and refused, if there be any; 8. A copy of all charges given and of the endorsements thereon.' "

The court having held (104 U. S. 631,) that "the giving, without the defendant's consent, of any oral charge or instruction to the jury, is an error, for which judgment must be reversed," held, when the case came up again on error on a second conviction, that "the requirement of the statute that the clerk of the court in which the trial is had shall include, in making up its record, a copy of all written charges, as well as of the minutes of the trial, is equally positive. * * * The record must either set forth the charge in writing, or a waiver by the defendant of such a charge. If it does neither, it fails to show what is made by express statute an essential requisite to the validity of the conviction, and contains upon its face a fatal error, of which the defendant may avail himself by appeal, without tendering a bill of exceptions. The duty of making up a complete record is the duty of the clerk; and the duty of seeing that the record contains everything that actually took place, necessary to support the conviction, is the duty of the district attorney. If the copy of the record made up by the clerk of the district court, and entered by the defendant in the Supreme Court of the Territory, was defective in a material point, the district attorney might have moved in the latter court to have the defect supplied by *certiorari* or other proper process. The defendant and his counsel were under no obligation to cure, and cannot be held to have waived, any defect in the record, but

were entitled to take advantage, either in the Supreme Court of the Territory, or in this court, of any error apparent upon the record as it stood in that court. Applying these principles to the record before us, the conviction cannot be supported. The record merely states that the court charged the jury, and does not state whether the charge was written or oral. If the charge was written, it should have been made part of the record, which was not done. If it was oral, the consent of the defendant was necessary, and that consent does not appear of record, and cannot be presumed." *Ib.*

Our statute prescribes that "unless the parties to the cause on trial either in person or through their attorneys shall file therein their written consent that the court may charge the jury orally, it shall be the duty of the court, except as provided in the next succeeding section, to reduce to writing and read its charge to the jury and the manuscript of such charge, signed by the court, shall be filed in the cause, and shall constitute a part of the record thereof. Whenever, and as often as the court shall depart from such duty, either party to such suit shall be entitled, as a matter of right, to demand and have granted a new trial of such cause." Sec. 1356, C.L.

"It shall be the duty of the stenographer in such case to transcribe his notes of such charge within one week thereafter, and to file the same, duly certified in said cause, and such transcript may thereafter be used and referred to in like manner as though the same had been written, charged and filed by the court, as provided in the last preceding section." Sec. 1357, *Ib.*

"It shall be the duty of the counsel for the respective parties to a cause, to furnish the court with a written memorandum of their request for the charging of the jury upon the points of law involved therein, and it shall not be incumbent upon the court, in cases where the parties are so represented by counsel, to charge the jury upon the law, unless thereto so requested in writing." Sec. 1358, *Ib.*

"All written requests for instructions shall be filed in the cause, and shall form a part of the record therein; and the court shall in no case orally qualify, modify or explain the same to the jury." Sec. 1359, *Ib.*

The Utah case, having been brought up on error, required the court to look through the entire record to ascertain whether it showed error; but the present case is on exceptions, which do not require examination of the record further than it is presented for the purpose of sustaining the exceptions. As the defendants took no exception to failure of the judge to reduce his charge to writing, it is to be inferred that the charge was reduced to writing or taken down by the stenographer. In either case it could have been obtained and presented with the bill of exceptions, if the defendants' attorneys, on discovering its absence, had made proper application to the Circuit Court. That was the course to follow, if it was desired that this court say whether the charge was erroneous or not. *Buckman v. Whitney,* 24 Cal. 267; *Tomlinson v. Funston,* 1 Iowa 544; *Lobdell v. Marshall,* 58 N. H. 343; *Tabor v. Judd,* 62 *Ib.* 292.

A similar course should have been taken to present copies of requested written instructions, if any there were, filed and refused by the court. The absence of such requested written instructions, or of any showing from the defendants' attorneys at the trial that they were made and filed, justifies the inference that none were made or filed.

In *Clune v. U. S.,* 159 U. S. 590, (40 L. E. 270,) it was claimed that the verdict was against the evidence. The court said that the contention could not be sustained "unless all the testimony, or all upon some essential fact, is presented." The court further said in that case: "Finally, there is a claim of error in the instructions, but the difficulty with this is that they are not legally before us." The journal entry showed that the jury were brought into court and announced that they had not agreed upon a verdict, and that the judge thereupon further instructed the jury by reading written instructions to them, to which the defendant's attorneys excepted. The court declined to consider the exception, on the ground that "no particular proposition is called to the attention of the court."

In *Nelson v. Flint,* 166 U. S. 276, (41 L. E. 1002,) it is stated that "the instructions which were given are not copied

in the record, nor is there anything in the bill of exceptions as to how long after the court had finished its charge to the jury this instruction was asked." The court therefore declined to consider whether there was error in the refusal to give the instruction presented, saying, "It does not affirmatively appear that it was presented under such circumstances as to demand consideration on the part of the court."

In *South Carolina v. Wesley,* 155 U. S. 542, (39 L. E. 254,) the circuit judge had filed an order overruling the plaintiff's motion to dismiss the proceedings for want of jurisdiction, and giving his reasons in that behalf. The court said: "It is difficult to deal with such a record as this. The order of April 16 was entered nine days after the return of the verdict, and apparently no exception was preserved to its entry. What passed upon the trial does not appear, as no bill of exceptions was taken." The court held that the defects in the record could not be supplied "by reference to the transcript of the record in a case pending in another court to supply defects in the records of a case in this court."

We therefore decide that the defendants' contention that a new trial must be granted in consequence of the disappearance or absence of certain papers from the files cannot be sustained.

In order to consider the questions of law presented at the trial it was neither requisite nor proper to file in this court the exhibits of the swords, kimonos, piece of cloth, pants, shirt and knife, nor was the map which was used in evidence required to be exhibited to us for the purposes of this case.

"A bill of exceptions should only present the rulings of the court upon some matter of law—as upon the admission or exclusion of evidence—and should contain only so much of the testimony, or such a statement of the proofs made or offered, as may be necessary to explain the bearing of the rulings upon the issues involved." *Lincoln v. Claflin,* 7 Wall. 136.

In addition to exceptions to denial of the motions to quash, for separate trials and for continuance, for a new trial, and to instructions given and refused, forty-eight exceptions were

taken concerning the evidence and to rulings upon the examination of witnesses, an exception to the verdict as "contrary to law and the evidence and the weight of the evidence," and an exception to the sentence which was imposed.

The exceptions to the rulings concerning the evidence for the prosecution of the witness Kodama Katsutari are as follows: The witness, having testified that on the evening of July 24 he had seen the defendant Funakoshi, was asked to relate the circumstances of his coming to meet that defendant and then after objection by defendants testified that in response to certain information he went into the room where he met said defendant who said to him, "You come to ask for some money to repay you some money due you," and answered, "Yes, sir, I came to ask for some money, because I loaned it." The witness testified that he loaned the money to a woman Nakamura Tokue living in Funakoshi's house who had come to the witness' house and asked him to loan her fifty dollars; the witness told her that he had no money but might get it from somebody and that he borrowed it from Motohiro and then loaned the money to Tokue. That it was concerning this money transaction that the witness talked with the defendant Funakoshi on that evening. When Funakoshi asked the witness if he came to get the money to repay the loan he was answered, "Yes, is anything the matter if I ask for the loan," the defendant said "What are you talking about; this woman is made out of gold I don't see why she went and borrowed any money," referring to the woman Nakamura Tokue. The witness went on to recite in full the rest of the conversation.

Exceptions (6, 7, 8 and 9) were to the witness' testifying as above that he had information, in response to which he went to defendant's room, and to his conversation there with the defendant, and to his testimony that he negotiated the loan for Tokue. The witness having testified in cross-examination that he was afraid of Funakoshi and the ones that were under him, was asked on redirect examination to explain that,—gave as his reason that when he was "taken back to Kagatani's house he said

he would be a friend of mine if I obeyed him, but if I did not obey him he said that he do something for which he would be hung, or something big would happen to him," and further in answer to a question, "Will you explain what you mean when you say that Funakoshi had a lot of people under him, what were they doing under him," testified, "I do not know what they did, but they just run around town, some of them wrestlers I do not know what their occupation is," and to the witness' further testimony in response to the question, "Who is over them," that he "thought it was the man who owned the house who owns Funakoshi's house in which house these people lived."

Exceptions (10, 11, 12 and 13) were taken to the foregoing testimony on cross-examination.

Exceptions (14, 15, 16, 17, 18 and 19) to the rulings concerning the evidence for the prosecution of the witness Honda Toyodo were as follows:

The witness testified to a conversation she had with Motohiro about a money matter while Watanabe was in the room although she could not state exactly "whether it was about this money matter or not," after the conversation that she and Miyamoto went to raise money coming down to Hata "to Hata one in rear and one in front street" in order to raise money, one thousand dollars; that she went twice the same day to Funakoshi's, the second time seeing Funakoshi, Watanabe, Seo and two other people and Motohiro, several persons being downstairs and several above in the house. She testified to the conversation in considerable detail. The defendants excepted to all the foregoing testimony of this witness and to the denial of the court of their motion to strike out the evidence of the conversation concerning the money "based upon the promise of Watanabe between Miyamoto and Motohiro and this witness".

In the evidence for the prosecution of the witness Hata Mitsutoro exceptions (20, 21, 22, 23 and 24) were taken by the defendants as follows:

The witness having testified that he saw Funakoshi on the

morning of the previous July 25 at Funakoshi's house and also that he saw Motohiro that morning at the same house upstairs in a small room and asked to explain how it was that he went there then, answered "The reason I went up there is Honda was called up to Funakoshi's house and after Honda came back asked me to raise the sum of one thousand dollars." The court denied the motion to strike out this answer. The witness having testified that after this conversation with Motohiro and in pursuance of it "he was trying to raise the money" being "the sum of one thousand dollars" and that this money was "for Motohiro", the defendants excepted to the denial of their motion to strike out that evidence, and the same with reference to the witness' evidence of the fact that he had a conversation that day with Miyamoto.

Defendants' exceptions 25, 26 and 27 relate to the proceedings in which the jury viewed the premises. As appears from the transcript of record (p. 65), the court remarked, "It is suggested to the court by members of the jury that they would like to view the premises and in as much as this is a capital case and every element and opportunity ought to be given for the jury to have element of light——

DEPUTY ATTORNEY GENERAL. I think it would be better to go down now, so that the jury could be put in possession of all the facts.

Mr. Le Blond agrees.

MR. ROSS. If the court please, in connection with this matter when the jury goes down there the defense only desires that the protection of the law be observed.

Discussion of the matter.

THE COURT. The court, upon an agreement of counsel, went to view the premises at 11:20 A. M.

Proceedings on premises.

THE COURT. The sheriff has been sworn.

MR. ROSS. Defense objects to any questions asked by the Attorney General of the sheriff, jury can ask any questions.

THE COURT. Objection overruled and exception allowed."

Thereupon in response to questions by jurors the sheriff described to the jury precisely in what position the body was found, its appearance when found, the time that he went there and the occasion of his going upon receiving a telephone message from officer Overend, what he found in the room, the fact that he found a number of Japanese in the room including the two defendants; also in answer to questions by jurors, officer Overend described the conditions of things as he found it in the room where the body of deceased was lying. The court as shown by the transcript "went to view the premises at 11:20 A. M. (*Ib.* p. 65). "Session resumed in the court room at 12:25 P. M." (*Ib.* p. 70.)

Upon the view at the premises the defendants objected to the sheriff answering the questions of a juror as to the location of the body when it was found "unless he was present at the time the body was first found" or describing the position, and objected to the officer describing the position of the body as he saw it when he first arrived there.

The record shows that the attorney for the defendants Mr. Ross was asked by the court "Have you any questions to ask while we are all here?" "Mr. Ross. I would like to ask the sheriff one question," which he proceeded to do.

At a later stage in the trial the court said to the jury, "After examining the authorities as well as possible during the hurry of the trial, I have found that evidence taken on the scene of the alleged crime is not admissible. It is therefore all ordered stricken from the record, and, if the prosecution wish to get the benefit of it, they will have to produce it in the same manner they would any other evidence. I will therefore say, gentlemen, that you will in all respects disregard any statement made to you or by you while viewing the scene of the alleged homicide for which these defendants are now on trial before you. Authorities are not uniform as to the admission of such evidence and as we have no statute on the subject, all you are permitted to do is to view the premises in silence. If the prosecution wish to avail themselves of any evidence they must adduce it in open

court. While the defendant and his counsel were present dur-
ing the viewing of the scene of the alleged homicide, yet I deem
it in the interests of justice to exclude everything excepting the
viewing." (*Ib.* p. 91.)

Defendants excepted (exception 33) to the foregoing state-
ment by the court and "to the striking from the record and
instructions given to the jury at this time."

Defendants' exceptions 28, 29, 30, 31, 32 and 33 relate to
rulings concerning the evidence for the prosecution of the wit-
ness Minato Kanzo Buro he having testified that on July 24
and 25 he was living in Funakoshi's two houses, living in the
smaller of Funakoshi's two houses running errands for him and
others, cooking for Nakamura Tokue who was Funakoshi's con-
cubine, and that Funakoshi was "a professional gambler,
extorter, blackmailer;" that about midnight of the 24th, Funa-
koshi came to the house and woke him up passing witness' room
and going to Nakamura Tokue's room turned down her mos-
quito bar and waking her up, asked her whether she had ever
borrowed money from a carpenter and if she went to Kodama's
room with that carpenter; then Tokue answered that she never
did and was never in Kodama's room; that Funakoshi then said
that she was lying and started to beat her; that witness then
went into his room to change his clothes and after changing
them they came out and Funakoshi was leading Tokue out and
"told me to bring all her clothes to his house." Defendants
objected to the foregoing conversation. The witness having
testified that Funakoshi had told him to go upstairs to
watch both of them was asked whom he meant by both
of them. The defendants excepted to the allowance of
the question, the answer to which was "It was Nakamura Tokue
and Motohiro was the only persons upstairs." The witness
having testified that he had been told by one Seo in the presence
of the defendants and others "to go down and hurry up and
ask him to have that money in a hurry the Kinau was leaving
in just a little while" and that "this money for Motohiro to give
to Funakoshi," was asked towards the end of his direct-examina-

tion "How much money were you to go and get if you know,"
answered "thousand dollars," which answer defendants
objected and excepted to.

On cross-examination of this witness objection of the prose-
cution was sustained to the question whether the witness had
been confined in a cell or had the privileges of the grounds.

In the redirect-examination of the witness defendants
excepted to the court allowing the witness to be asked by the
prosecution and to testify what the errands were for to which
he had referred in his testimony in chief.

Defendants took exceptions 34, 35 and 36 to rulings upon
the evidence for the prosecution of the witness Nisawa. The
witness, a hack-driver, having testified that he saw the defend-
ants July 25 at Funakoshi's house and that he saw Motohiro
there that evening in a small room upstairs where the defend-
ants were and that after taking a message upstairs to Funa-
koshi went downstairs, was asked "What took place immediately
after that" to which he answered "I heard a gurgling noise
upstairs." Defendants excepted to the refusal to strike out this,
answer as not responsive, and excepted to the evidence of the
witness that he was asked to go upstairs to see what was the
matter.

In cross-examining this witness defendants excepted to the
refusal of the court to strike out an answer of the witness to
one of their questions as voluntary statement and not responsive
and also excepted to the refusal of the court to allow them to
ask the question "Could Seo's wife from where she was sitting
see the stairs," the prosecution having objected to this question
as calling for a conclusion of the witness.

Two exceptions (37 and 38) were taken by the defendants
during the cross-examination of the witness Hosatimie for the
prosecution, namely, to the refusal of the court upon the objec-
tion of the prosecution to allow the defendants to ask the wit-
ness whether in his testimony before the committing magistrate
at the examination of the defendants he did not testify that "as
soon as he heard this gurgling sound he got and of course he

went near the door-way, the gurgling noise was going on then;" the objection by the prosecution to this question was, it assumes a fact not in evidence and the record does not show anything upon this subject. The further exception was to the refusal of the court to allow the witness to be asked whether he did not testify in the preliminary examination in answer to question "How long did that lady sit in the room where the deceased was when you got there", and you said "it was all the while I was there, when I went in Funakoshi asked me to eat supper, I was in there all the while and I had supper." The objection of the prosecution to this question was that it "was meant to impeach him on this ground."

Two exceptions (39 and 40) were taken to the evidence of Nakamura Tokue to the witness testifying that Funakoshi on the night of July 25 came to her house, tore the mosquito netting down, cut her neck and told her to get up striking her three or four times, and to the conversation which then occurred between the witness and Funakoshi in which Funakoshi told the witness to call Motohiro and there was talk about the thousand dollars which Motohiro was asked to produce; what was said in the presence of Funakoshi was excepted to.

Exception 41 to the evidence of the witness Morita Kizo was to the refusal of the court to strike out an answer of the witness explaining the number of times that the defendant Watanabe on July 25 came to the house of the witness and that he came and went naked.

Exception 42 was taken to the evidence of the witness Miyamoto that after a certain conversation with Motohiro the witness and Honda went to Noeke's house.

Witness McKenney having been called by the prosecution to testify as a chemist, upon the result of his examination of the charred remains submitted to him by the sheriff, testified that he had been a chemist for fifteen years, was not a graduate from any institute, was a licensed druggist. Defendants objected, that the witness was not shown to be an expert and excepted (exception 43) to the overruling of their objection. The wit-

ness thereupon testified that he found animal charcoal in the charred remains, which from comparative tests and chemical tests he "would state had been produced by the charring of blood" and it was impossible to say that it was human blood.

Dr. Holland having been called for the prosecution testified that he had been for twenty-five years a physician and surgeon, graduating from the Atlanta Medical College. The court asked the witness the following question: "Supposing, doctor, that in the right side of the neck an open wound is $1\frac{1}{2}$ inches to 2 inches long, it passes through the neck severing the carotid artery and external jugular vein, it comes out at a portion back of the neck and makes a groove in the vertebrate on the right side of the neck, which hand would an ordinary man, and in your opinion would be used most likely? The right hand or the left hand in the infliction of a wound by himself?" The defendants excepted (exception 44) to the overruling of their objection to the question on the ground "that it did not call for expert testimony and was not based upon anything in this case."

The defendants in cross-examining this witness asked him the following question: "Suppose that the evidence in this case will develop the fact that the deceased within a half an hour prior to the time of his death went down the stairs, out into the yard into the rear house, came back into the house and walked upstairs unaccompanied or unassisted by any one and went into his room and was found there with a wound in his neck at the right side about two inches in length, and also a wound at the right and back of the neck, the man lying prone on his face, left hand extended and the right hand at an angle of 45°, lying on the right side of the face, with the knife, exhibit 'I', lying one and half feet at his right side and about ten inches from his elbow under a cloth on the floor, state whether or not the wound could have been inflicted by a man himself?" The prosecution objected to this question on the ground "that it assumes a fact not in evidence."

The defendants excepted (exception 45) to the sustaining of this objection.

Defendants excepted to the refusal of the court to grant their motion to strike out the testimony of the witnesses Hata, Honda, Kodama, Kobe and Tokue wherein they testified as to extorting money from the deceased Motohiro—for the reason that the same is incompetent, irrelevant and immaterial, and that the Territory did not make the connection that they promised the court when the court admitted the testimony and also to the refusal of the court to strike out the evidence of the witness Hata for the same reason and further excepted to similar motions with reference to the testimony of the witnesses Kodama, Kobe and Tokue; and to the refusal of the court to strike the testimony of the witness Tokue of the personal injuries that she had received. The court in overruling this motion gave as reason "among other things that counsel failed to make these motions at the conclusion of examination in chief of each of the witnesses and, in the absence of such motion, proceeded to cross-examine the witness in detail and at length." The foregoing exceptions are numbered 46, 47, 48, 49, 50 and 51.

Exceptions 52 and 53 were taken by the defendants upon the cross-examining of their witness Mrs. Seo, namely, to allowing the prosecution in cross-examining her to ask the question "Had Motohiro ever been into that house to your knowledge" to which the witness answered, "I do not know"; and to further question on cross-examination "By the way, you are the wife of a man by the name of Seo, who has evidently been indicted by the grand jury for conspiracy growing out of this transaction, are you not?" to which the witness answered that she was.

In argument defendants' attorneys laid much stress upon the court taking the jury to view the premises where the crime charged was said to have been committed, and upon what took place there as above described. It is insisted that the proceeding was illegal, amounting to holding court in a place unauthorized by law, and that the effect on the jurors of hearing the evidence there presented could not have been removed by the

court afterwards instructing them to disregard it. It is claimed that the consent of the attorneys of the defendants to this course was not enough, but that the defendants' consent, if that would suffice, which is doubted, was absolutely essential.

Exceptions twenty-five, twenty-six and twenty-seven, relating to this subject, when compared with the transcript, show that the twenty-fifth exception was simply to the sheriff answering the question of a juror concerning the location of the body when he found it "unless he was present at the time the body was first found."

The twenty-sixth exception was taken to the evidence of the deputy sheriff Overend upon his being asked to describe the position of the body as he saw it when he first arrived there, he having already testified that he was "the first officer to arrive here when the tragedy was reported." The objection made was "Object to that at that time here improper."

The twenty-seventh exception relates to the defendants' objection to any question by the attorney general to the sheriff, which objection the court overruled. It does not, however, appear that any questions were asked by the attorney general, but on the contrary, that all the questions were asked by jurors, with the exception of questions asked by the court as to which officer had got there first, and two questions asked by the defendants' attorneys in response to the inquiry of the court, "Have you any questions to ask while we are all here?" There is no basis, then, for this twenty-seventh exception.

The twenty-fifth exception taken to the sheriff describing the condition of the premises unless he was present when the body was found, and also the twenty-sixth exception to the deputy sheriff Overend, who is shown to have been the first officer present, testifying as to what he found "at that time," can not be regarded as exceptions to taking the jury to view the premises. It is to be observed that according to the transcript the defendants' attorneys agreed that the jury should view the premises. (p. 65 *Ib.*) The bill of exceptions, purporting to have been made from the transcript, contains what may perhaps be

regarded as a clerical error in using the word "argues" instead
of "agrees." (Bill of exceptions, p. 22.) The following is the
transcript (p. 65 *Ib.*):

"Mr. Le Blond agrees.

Mr. Ross. If the court please, in connection with this mat-
ter when the jury goes down there the defense only desires that
the protection of law be observed."

The thirty-third exception relates to the direction of the court
that the jury disregard any statements made to them while view-
ing the scene of the alleged homicide. This exception, however,
was neither argued nor referred to in the defendants' brief, and
requires no comment. As no exception, other than above men-
tioned, was taken to the legality of the view, or to the proceed-
ings had there, questions concerning them are not before us,
further than to say that the statements of the sheriff and deputy
of conditions which they found on the premises were compe-
tent as far as the character of the evidence is concerned. Indeed,
so far from excepting to the view, defendants' counsel expressly
consented. The condition named in their consent, that "protec-
tion of law be observed," did not dispense with the necessity of
excepting to any step which was claimed to be an infringement
of the defendants' rights or a denial to them of the protection
of the law. The exceptions which were taken were not such as
can be sustained. It was competent to show the conditions of
the *locus in quo* as found by the sheriff and deputy sheriff shortly
after the event, and it was for the defense to show, if it were
true, that those conditions did not exist at the time of the death
of the decedent. Although the bill of exceptions does not
require an adjudication of this matter, it has been the practice,
we understand, in Hawaii, as it was at common law to allow
the jury in criminal cases to view the premises.

The Supreme Courts of Georgia and Texas hold it to be
reversible error in a criminal case for the court to permit a
view. *Smith v. State,* 42 Tex. 444; *Bostock v. State,* 64
Ga. 639.

In *Com. Wealth v. Knapp,* 9 Pickering 515, the court denied

the prisoner's motion in a prosecution for murder, that the jury should view the house where the murder was alleged to have been committed, saying, "It does not appear to us that a view is necessary. It is attended with many inconveniences. We know not what the jury may hear and what impressions may be made upon them while they are taking a view. The case should be decided by the evidence given in court." At a second trial of the case, upon the request of the jury to visit the place, and counsel on both sides and also the prisoner consenting, permission was granted. The court did this with hesitation, regarding the course as without precedent, and doubting whether they could hold the prisoner to his consent. At the view the jury were permitted to take with them plans which had been shown and explained to them in court.

But in *The Queen v. Martin,* 1 Crown Cases Reserved 378,. the court held: "It is always in the discretion of the court to allow a view or not, although such precautions as may seem to the court necessary ought to be taken to secure that the jury shall not improperly receive evidence out of court."

"In a criminal prosecution there can be no view without consent; and such was the practice before the 4 Ann. c. 16  *R. v. Redman,* 1 Keny. Rep. 384." 5 Bac. Abr. 375.

In the view above expressed it is unnecessary to say whether the instructions to disregard the statements taken at the premises would remove the effect of illegality of the proceeding, if such illegality were shown; or whether the fact that the deputy Overend afterwards gave in the court room the same evidence which he had given to the jury at the premises would remove illegality, if any there were, in his statements made at the premises, owing to the jury having heard what he said in the impressive surroundings of the *locus* and with the ocular demonstration which is so much more effective than description.

As above shown, a large number of exceptions were taken to the admission of testimony showing a conspiracy on the part of the defendants to extort money by blackmailing and false accusations; also showing the manner of living of the defendant

Funakoshi "with a lot of people under him" "who ran around town, some of them wrestlers," and to any evidence of conversations relating to any of such matters. The evidence objected to was admissible, notwithstanding that it showed other offenses.

"The rule is well settled that 'proof of other offenses may be admitted to prove scienter or guilty knowledge or to make out the *res gestae* or to exhibit a chain of circumstantial evidence of guilt in respect to the act charged.' Wharton's Crim. Ev., Sec. 650." *The Queen v. Leong Man,* 8 Haw. 341; *Rep. of Haw. v. Tsunikichi,* 11 *Ib.* 344; *Rep. of Hawaii v. Yamane,* 12 *Ib.* 189.

"The fact that the testimony also had a tendency to show that the defendant had been guilty of Camp's murder would not be sufficient to exclude it, if it were otherwise competent." Per Cur. *Moore v. U. S.,* 150 U. S. 157.

In examining the record of testimony with reference to the exceptions taken to its admission, or refusal to strike out, or in the direction of the examination or cross-examination of witnesses, we see no reversible error.

It does not appear that any of the facts admitted in evidence against defendants' objection were irrelevant to the evidential facts on which the defendants' guilt might properly be based, nor was any of the evidence to which the defendants objected irrelevant for the purpose of showing either the main or subordinate facts. If in any instance irrelevant evidence was admitted it was not of a nature prejudicial to the defendants in the minds of the jury.

Nor can the verdict be set aside on the ground that it is contrary to the evidence or is not sustained by the evidence.

The fact that a witness for the prosecution admitted in cross-examination the possibility of suicide was before the jury; it was for them and not for the witness to decide whether or not the evidence on the whole showed beyond a reasonable doubt in their minds that the defendants had committed the crime charged against them.

We overrule defendants' exception thirty-seven to the court

refusing to allow the defense to ask the witness Hosatani the question, "If you swore to that" (meaning a statement at the preliminary examination which he had testified that he did not remember,) "which is true, the statement that you made at that time or the statement that you made today?"

The same witness having testified for the prosecution, among other things, that he had massaged the defendant Funakoshi in a certain room in the defendant's house on the night of the alleged murder, and having heard a "gurgling noise" from the next room, after which the defendant Watanabe came in, saying "Done up; done up; wahine, dead; dead; dead;" that then Funakoshi looked into the room and returned and laid down, and having further described what was said by the defendants upon that occasion, and what occurred, as for instance, that the witness noticed blood all over in the inner room when he looked into it, said in cross-examination that Funakoshi and the woman there ate their food in the room, which the woman had brought in upon a tray, but that the witness did not know who carried the tray downstairs, and did not himself eat there after he began to massage, was asked by the defense if he did not testify at the preliminary examination that the woman in the room with Funakoshi was there all the while the witness was there, and that when he went in Funakoshi asked him to eat supper, and she was there all the while he ate. The thirty-eighth exception, which was taken to the refusal to allow this question, is overruled on the ground that the evidence sought to be impeached does not appear to have been sufficiently material to the issue. The rule is that "a party has the right to call witnesses for the purpose of contradicting material evidence given by a witness for his opponents." 10 Ency. Pl. & Pr. 280. As a consequence, the former testimony which is sought to be contradicted must be "material to the issue on trial." *Ib.*

The forty-third exception relates to the overruling of the defendants' objection to the chemist McKenney testifying as an expert upon his analysis of a charred cloth substance which was in testimony, in which he testified that he found on making

tests the appearance of blood, but whether human blood or not. he could not say. We see no error in the ruling of the court admitting this witness as an expert upon this subject.

We will consider together exceptions forty-four and forty-five to the question which the court asked a medical witness for the prosecution, and the refusal of the court to allow the defendants to ask the witness on cross-examination a hypothetical question in the form proposed. There is no objection to the form of the hypothetical question asked by the court, and it was an appropriate question to ask of the medical expert.

The question ruled out which is above stated was objected to as assuming a fact not in evidence, and was ruled out by the court for the same reason, namely, as "not predicated upon the facts." It is erroneous to allow hypothetical questions unwarranted by any testimony in the case. "A question based on an assumption which the evidence neither proves nor tends to prove is misleading." Rogers on Expert Testimony, 2 Ed., p. 67. Defendants' attorneys have not pointed out to the court in their oral arguments or in their briefs the evidence on which the hypothetical question would properly be based. We think, however, that the question was objectionable in asking the expert witness to state his opinion on matters of such a general nature which do not authorize an expert opinion.

The following statement taken from the brief for the prosecution is sustained by the evidence, to wit:

"The evidence shows that the defendants were persons of exceedingly bad character, known to be gamblers, blackmailers and extortioners.

"That on the twenty-fourth day of July, nineteen hundred and two in the night time of said day, the defendants sent to the house of one Nakamura Tokue (w.) and demanded her presence before them.

"That they then and there accused said Nakamura Tokue with having had, prior to that time, criminal intercourse with said Motohiro and that she had borrowed a certain sum of money from said Motohiro.

"That at the time above mentioned said Nakamura Tokue

denied that she had had such criminal intercourse with said Motohiro but admitted that she and other friends of hers had borrowed from him the sum of fifty dollars.

"That these two defendants thereupon sent for said Motohiro and that he was brought to the house of defendants and there interrogated as to the accusation by them made against himself and said Nakamura Tokue and that he denied having had criminal intercourse with said Tokue, but admitted that he loaned her a sum of money, as alleged.

"That thereupon these two defendants cruelly maltreated both said Tokue and Motohiro, that they beat them and that said Motohiro was so severely beaten with an iron rod that he was left after said beating in a helpless condition and was so weak that he could not even assist himself down the stairs.

"That these two defendants threatened to kill both said Motohiro and said Tokue and said they would tear said Tokue to pieces and finally presented said Tokue and said Motohiro and each of them with a large knife and ordered and demanded of them that they cut each others right arm off, upon the doing of which, these defendants said that they would forgive said Motohiro and Tokue.

"That it was claimed by the defendant Funakoshi that said Tokue was his concubine and he gave that as his reason for beating and ill treating said Tokue and said Motohiro.

"That after said beating and maltreatment and threats to take the lives of these two parties, these two defendants informed them that they would kill them if they did not give them a large sum of money, in the case of the woman, two thousand dollars and in the case of the man, one thousand dollars.

"That these defendants sent for the clothing belonging to said woman and ordered the same to be burned and they confined the said Tokue and the said Motohiro in the house of said Funakoshi at Hilo from midnight of the twenty-fourth day of July, nineteen hundred and two until the time of the death of the said Motohiro the following day.

"That during the time of said confinement of said Motohiro and said Tokue, said parties, through their friends, attempted every possible means to raise sufficient money to satisfy the demands of these defendants, but failed in their efforts.

"That about twelve o'clock noon of the twenty-fifth day of July in said year, Tokue was sitting with the defendant Funa-

koshi and another Japanese in a room next to the one in which said Motohiro was confined.

"That just prior to that time, the defendant Watanabe had been seen to enter that room.

"That Tokue was in a position where she could see the defendant Watanabe if he should leave the room and that she did not see him leave the room prior to the death of Motohiro.

"That while sitting in said room with the defendant Funakoshi, she heard certain sounds which she described (p. 148, sten. min.) 'heard a noise like striking coming from Motohiro's room and then I heard a moan and gurgling. Then something fell, like a body. Then I heard some one walking in the room.'

"That after that the Japanese who was in the same room with the defendant Funakoshi and who was alleged to have been giving him, the said Funakoshi, lomilomi treatment, was requested to go to the door and look in the door of the room where Motohiro had been confined and see what was the matter.

"That just prior to this time and before said sounds had been heard, to come from said room where said Motohiro was, the defendant Watanabe had had a whispered conversation with the defendant Funakoshi, the only words of which intelligible to the witness were, 'All right.'

"That the witness Hosotani upon opening the door looked into said room and saw that the floor of said room was covered with blood, came back very much frightened and told the defendant Funakoshi that Motohiro was dead. Also suggested calling a doctor.

"Within a few minutes thereafter the defendant Watanabe came running back and said to Tokue, 'Done up. Done up. Dead. Dead,' referring to deceased.

"That after the discovery of the dead body of Motohiro in the room aforesaid, both of the defendants attempted in every way possible to manufacture evidence, so that in the event of the death of the said Motohiro being questioned in the courts, all of the persons present would testify, falsely, that he committed suicide.

"That they promised favors and rewards to the said Tokue if she would testify 'straight' as they called it and threatened her life in the event of her telling what she knew about the death of Motohiro."

Because there was evidence on which, if believed, a doubt of

the defendants' guilt might be based, we cannot say that such doubt ought to have arisen, or that it was in fact produced in the minds of the jury. The doctrine which in effect requires the opinion of the court to be substituted for that of the jury concerning the credibility of evidence, even when guilt is claimed upon circumstantial evidence alone, is not accepted by this court as law.

The evidence justified the finding that the defendant Funakoshi abetted the defendant Watanabe in the commission of the offense charged.

"Any person who not himself being present at the commission of an offense, abets another in the commission thereof, or procures, counsels, incites, commands or hires another to commit the same, which such other thereupon, in pursuance thereof, commits, is an accessory before the fact, to the commission of such offense." Sec. 27, P. L.

"Every person who aids in the commission of an offense, or is accessory before the fact thereto, is guilty of such offense, and shall be subject to punishment therefor, in the same manner and to the same effect as if he had been present at the commission thereof and actually taken part therein." Sec. 28, P. L.

The verdict was fully sustained by the evidence in the case.

The venue was shown to have been at Hilo where the court was held.

The defendants took exception to the judgment pronounced (transcript, p. 274,) stating no grounds for the exception. In their brief they claim that the court "before passing sentence should have asked them if they had anything to say why sentence should not be pronounced," and that "this the court failed to do." It appears from the transcript that the court, after learning from the defendants' attorneys that they had "no objection to sentence being pronounced at this time," interrogated the defendants as to their age, the length of residence in the Territory, and whether they understood that the jury had found them guilty of the death of the deceased, informed them of the sentence authorized by law, which was thereupon imposed. As we have repeatedly had occasion to remark in the discussion of

these exceptions, this case does not come up on error. No ruling was made by the court on the subject of the necessity of asking the exact question referred to, and the question is not before us.

The exceptions are overruled and the case is remanded to the Fourth Circuit Court.

*M. F. Prosser,* Deputy Attorney General, for prosecution.

*Cathcart & Milverton* and *George A. Davis* for defendants.