# TERRITORY *v.* EDWARD K. DUVAUCHELLE, WALDEMAR DUVAUCHELLE AND JOHN DUVAUCHELLE.

## No. 1579.

### EXCEPTIONS FROM CIRCUIT COURT SECOND CIRCUIT. HON. D. H. CASE, JUDGE.

ARGUED FEBRUARY 13, 1925.　　　　　　　　DECIDED MAY 1, 1925.

### PETERS, C. J., PERRY AND LINDSAY, JJ.

CRIMINAL LAW—*corpus delicti—proof of.*

In a prosecution for homicide a conviction cannot be sustained unless the *corpus delicti* and the connection therewith of the accused have been proven beyond a reasonable doubt, but the *corpus delicti* like any other issue involved may be proved by circumstantial as well as by direct evidence. No universal and invariable rule can be laid down as to what will amount to proof of the *corpus delicti*, as each case must depend on its own peculiar circumstances; and where there is any evidence (more than a mere scintilla), direct or circumstantial, sufficient in law to establish the *corpus delicti* it is for the jury to pass upon its weight.

EVIDENCE—*hearsay.*

Testimony of witnesses of statements made by deceased to the witnesses shortly prior to the alleged murder to the effect that his fish pond had been robbed is not hearsay and is admissible, not to show that the pond had in fact been robbed, but as tending to indicate a frame of mind or intention on the part of the deceased which made it probable that deceased was or might be in the vicinity of the alleged murder at the time alleged.

SAME—*hearsay—harmless error.*

Two witnesses were permitted to testify to statements made to them by the deceased shortly prior to the time of the alleged murder. *Held*, such evidence not improperly admitted, and that if hearsay it was harmless, it appearing from other sufficient evidence that deceased had made such statements to others and it further appearing that it was the nightly custom of deceased to guard his fish pond and to go to the place where he is alleged to have been murdered.

EXCEPTIONS—*failure to preserve in trial court.*
> Where no exception is taken to an instruction in the court below it cannot be considered here.

TRIAL—*instructions—comment by court on evidence.*
> An instruction that there is evidence tending to show facts alleged in the indictment held not to violate section 2426, R. L. 1925, prohibiting trial court from commenting on the evidence.

OPINION OF THE COURT BY LINDSAY, J.

The defendants (Edward Duvauchelle and his two sons, John and Waldemar Duvauchelle) upon trial under an indictment charging them with murder in the first degree were convicted of murder in the second degree, it being charged in the indictment that on the fifteenth day of March, 1916, the defendants killed one Wòng Waiboud at Keawanui on the Island of Molokai by assaulting him, binding him with rope, placing him in a boat and taking him out and casting him from the boat into the waters of Keawanui bay. The case comes here on exceptions.

The first exception that should be considered is that the trial court erred in refusing to grant the defendants' motion for a new trial on the ground set out in said motion, namely, "that the verdict is contrary to the evidence in the case, and against the weight of the evidence, and the evidence introduced at the trial is insufficient to support the verdict, among other things, that said evidence fails wholly to show that Waiboud is dead." Under this exception the defense contends that the evidence entirely fails to show that Waiboud is dead; and that the evidence in no way shows any connection between the defendants and the alleged death of Waiboud.

It is, of course, elementary that a conviction cannot be sustained unless the *corpus delicti* and the connection therewith of the accused have been proven beyond a rea-

sonable doubt.    The general rule is that in every criminal case the prosecution must prove the *corpus delicti* beyond a reasonable doubt.    "But no universal and invariable rule can be laid down as to what will amount to proof of the corpus delicti, as each case must depend on its own peculiar circumstances; and when there is any evidence, direct or circumstantial, to establish the corpus delicti, it is for the jury to pass upon its sufficiency." 7 R. C. L. 775.    Was the evidence adduced in the instant case sufficient to warrant a finding by the jury beyond a reasonable doubt that Waiboud is dead, and that his death was caused by the defendants in the manner alleged in the indictment?

The evidence produced by the prosecution showed that Waiboud was a young Hawaiian-born Chinese.    For a number of years prior to 1913 he worked as a clerk in the office of the registrar of conveyances at Honolulu, the registrar at that time being C. H. Merriam.    Mr. Merriam owned certain mullet ponds on the Island of Molokai, one of these being the Keawanui pond.    Under an arrangement between Waiboud and Merriam, Waiboud went to Molokai in 1913 to take charge of the fish ponds, the agreement being that for his services he should receive $75 per month (later raised to $90) and a share in the profits of the fishing business.    The fish were shipped to Wong Wai Wing, a brother of Waiboud, who resided in Honolulu and who attended to the sale of the fish and the sending of provisions to Waiboud on Molokai. Wong Wai Wing corresponded weekly with his brother on Molokai and Waiboud made regular monthly reports to Merriam as to the state of the business.    Waiboud continued to reside at Keawanui until March 15, 1916, those living with him at that time being his wife, his stepfather and a child.    For some time prior to this there was a noticeable diminution of fish from the ponds and

Waiboud, telling them that some one was stealing the fish, engaged Makaikoa Kaawa and James Poaha to guard the ponds at night.    Waiboud himself was also in the habit of nightly guarding his ponds, taking with him either a pistol or a shotgun.    Mrs. Waiboud testified that on two occasions at night, within two weeks prior to March 14, she had seen the defendant John Duvauchelle at the Keawanui pond, and on the Sunday night prior to Waiboud's disappearance the sampan "Annie Dee" belonging to Edward Duvauchelle was seen in the bay near the fish pond.    On the night of Tuesday, March 14, 1916, Waiboud and his wife went around the Keawanui pond, returning to the house about 11 p. m. when the wife went to bed and slept until about five the next morning when she awoke and found that her husband was not in the house.    The shotgun and the old clothes that he had worn were missing but everything else in the house was undisturbed.    Waiboud, at a quarter past three that morning, had awakened Dan Haoli, his stepfather, and sent him to Pukoo to get the mail that was expected. The last that Dan Haoli saw of his stepson was the latter standing outside of the house holding a lantern.    Waiboud not returning, his wife sent workmen to find him while she herself went down to the end of Keawanui pond to look for him.    She did not find her husband there but noticed that a coral stone that had for a long time lain on the beach and been used for tying boats to was missing.    The stepfather too, on his return from Pukoo, made unsuccessful efforts to discover the whereabouts of Waiboud.    The following day the disappearance was reported to the police and inquiries were made.    The defendant Edward Duvauchelle, who among others called on Mrs. Waiboud that day, suggested that Waiboud was in the habit of going out shooting goats and pheasants and Mrs. Waiboud testified that, on her saying that she believed

some one had killed her husband and cast him into the sea, Edward Duvauchelle blushed. On the next morning (Friday) a general but unsuccessful search for the missing man was made. On Saturday, March 18, 1916, Clem Crowell, the county sheriff, came over to Molokai for the purpose of making investigations but had not proceeded far on the case when he was suddenly taken seriously ill and after a week in bed at Molokai returned to his home on Maui and the investigation was allowed to drop. Since the said fifteenth day of March, 1916, nothing has been seen of said Waiboud, neither has his wife, brother, stepfather nor employer nor anybody else heard of him.

Four witnesses for the prosecution, John Kawai Cockett, John Healy, Charlie Rodriques and Jim Opu testified that they were members of a fishing gang which worked for Edward Duvauchelle. The head men of the fishing gang were Iona (a Hawaiian) and Suga (a Japanese). According to these four witnesses the fishing gang assembled at the house of Iona, where Duvauchelle kept his fish nets and boat, on the evening of March 14, 1916; that Edward Duvauchelle came there that evening and, after speaking to Suga outside of the house, went away. Suga on reentering the house said that they were to go fishing that night, and later the gang took the skiff with the nets and went over to Kalaeloa where they threw the nets on the windward side of Kalaeloa and pulled them up on the beach. The three defendants were seen there by these witnesses, and they helped to pull up the nets. The defendants then left this place and went across to a sand-spit to near the end of the stone wall where a stranded sampan called "Molokai" was lying. The fishing crew then got into the skiff and went around to the leeward side of Kalaeloa where they made another cast, and hauled the net up on to the beach at a place not far from the stranded sampan. The Japanese fisherman Suga went

*over to* where the defendants were standing.   Three of
these witnesses testified to having seen the light of a lan-
tern outside of Waiboud's house about half an hour before
Waiboud appeared at Kalaeloa.   Cockett testified that after
Suga went over to where the defendants were he heard a
scream and a splash in the water; that he did not see Wai-
boud but recognized the scream as Waiboud's voice with
which he was familiar.   The scream sounded "like some-
body killing him."   Then he saw the defendant John
Duvauchelle go to the old sampan and return to where
the others were;   that the three defendants and Suga
then got into a skiff belonging to Edward Duvauchelle
after picking up something, went out to sea in the skiff
past the sampan towards a large sunken rock in the bay
and shortly afterwards returned to the beach where they
had started from.   The fishing gang then, other than
Suga, boarded their boat and returned home as daylight
was beginning to break.   This witness also testified that
on the following Friday he met the defendant John
Duvauchelle who told the witness to keep his mouth shut
and not to say anything about Waiboud, and that if he
should say something "will kill you."   The witness
Charles Rodriques also testified that on Wednesday morn-
ing he met Edward Duvauchelle and the latter said to
him:  "If anybody ask if we went fishing that night tell
them no we never went fishing," and "If I tell he shoot
me."   This witness also testified that in July, 1923, when
he, the witness, went over to Molokai, on landing at
Pukoo he met Edward Duvauchelle and on telling him
that the sheriff had sent for him on account of Waiboud's
case, Duvauchelle told him to "keep quiet" and "if they
asked me where Waiboud is tell them he went home to
China," and that that evening while he, the witness, was
having dinner at his mother's place, John Duvauchelle,
the brother-in-law of witness being also present, John

Duvauchelle asked why he (the witness) had come over.
The latter replied that Sheriff Crowell had called him
over "about Waiboud's case," whereupon John got mad,
said "God damn it a bunch of fools" and left the table.
A witness, Harris (who was a detective working on this
case), testified that when John Duvauchelle was in cus-
tody, on August 11, 1923, he stated to Harris in the pres-
ence of Sheriff Crowell that he was with the fishing gang
on the night in question; that he went there in an auto-
mobile with his brother Weli (the other name for Walde-
mar), leaving the machine near Waiboud's house; that he
saw Waiboud that night come down the windward side
by himself with a gun and that he went toward the lee-
ward side.   Harris also testified that when John Duvau-
chelle was in custody "I asked him if he remembered
something that happened that evening with the fisher-
men, and he could not give me an answer.   Finally I
mentioned the name of Jim Opu and he said 'Yes, now I
remember, that was the night Jim Opu was met by a
ghost.' "   Mrs. Waiboud testified that on Friday Edward
Duvauchelle came to her house with Jim Opu.   Deputy
Sheriff Nakaleka also was there.   Opu told Nakaleka
that he was sent there by Duvauchelle because he (Du-
vauchelle) had forgotten something.   Nakaleka said no
one was allowed to go down the stone wall on the lee-
ward side of the fish pond unless a policeman went with
them, whereupon both of them went.   On the return of
Opu to the house he handed something to Duvauchelle.
The defendant and Opu then went away.   Nakaleka, the
deputy sheriff, died in 1919.   Jim Opu testified that on
Friday Edward Duvauchelle asked him to go to Keawa-
nui with him to look for a knife that he (Edward Du-
vauchelle) had lost.   Edward Duvauchelle told him to
look at the makai side of the pond.   The witness went
where he had been directed, with the deputy sheriff, and

found an IXL knife which he took back and gave to Duvauchelle. Neither Cockett nor Healy nor Rodriques ever went out fishing with the gang again after Waiboud's disappearance. Healy testified that, when they were hauling the net on the beach the first time, Waiboud came over from the windward direction, asked them if they were fishing in his pond, and being answered in the negative, he went over in the direction of the old sampan "Molokai;" that the defendant John Duvauchelle got hold of Waiboud who screamed or yelled and there was a splash; the three Duvauchelles and Suga were there. They had a rope and tied Waiboud up and took him in the skiff which Duvauchelle usually kept there and went out past the sampan in the direction of the sunken rock where the water is twenty to twenty-five feet deep, and later they returned to the shore without Waiboud. This witness said that of the fishing gang he was the nearest to the sea and he testified further that when the four men returned to the beach he heard Duvauchelle, Senior, say "It was good that the chinaman was killed;" and that Duvauchelle, Senior, told "us and myself that; 'if I say something he fix me.' " Rodriques testified that when they were on the beach on the leeward side of Kalaeloa he saw Waiboud come across from the windward side and that Waiboud spoke to them and then went over to where the defendants and Suga were. Then he heard a cry and a splash and saw the defendants holding Waiboud down and tie him with a rope which John Duvauchelle got from the old sampan, then put him in Duvauchelle's black skiff and go out to deep water. The four men returned in the skiff without Waiboud. Suga told the fishermen to go home and they went, leaving the defendants there. When the witness got home it was starting to get daylight—about five o'clock. Jim Opu testified that after the net was hauled up on the windward

side of Kalaeloa, Edward Duvauchelle asked him to take some of the fish home, that he started off with some fish, went about half way, then returned giving as a reason for his return that "a Chinese ghost or something" had frightened him. The witness said that when he got back to Kalaeloa the gang was about to start home and he went with them. Manuel Costa testified that on the day Waiboud was said to be missing he was staying at the house of Poaha, Senior; that on that morning at about half past four he left Poaha's place to go to Kamalo and as he passed by Keawanui he saw the defendant Edward Duvauchelle come out from the kiawe trees on the Pukoo side of Waiboud's house about seven hundred feet distance makai of the road. It was just getting daybreak. Later on that day the witness heard that Waiboud had disappeared. M. S. Figueira testified that at the time in question he lived at Pukoo, about half a mile west of the Edward Duvauchelle place, and that, at about five o'clock on the morning of the day that Waiboud was reported missing, he saw Edward Duvauchelle walking along the road going toward Pukoo from the direction of Keawanui. This witness also testified that on the Monday prior to the disappearance of Waiboud when he was going to work he met Edward Duvauchelle and asked him what he was doing there so early. Duvauchelle said he had come to see Waiboud, and "Well you know that son of a bitch is accusing my men of stealing fish, so I put him in a place where he don't mingle with my men;" also that on the following Thursday afternoon Edward Duvauchelle asked the witness to join a searching party the next day. The witness said he did not believe that the man was up the mountain, whereupon defendant Edward Duvauchelle asked: "Where do you think he is?" to which the witness replied: "You know, if any place that chinaman to be found that chinaman in the water;" and

that Edward Duvauchelle "got mad." James Poaha testified that about a month prior to the disappearance of Waiboud he had a conversation with Edward Duvauchelle in which said Duvauchelle asked the witness if he had heard anything that Waiboud said about him. The witness replied that Waiboud said: "You people going over there stealing my fish," whereupon the defendant said "God damn pake I don't know what I going to do to him."

Clem Crowell, sheriff of the County of Maui, testified that on March 20, 1916, when he was investigating the matter at or near the place where the stranded sampan "Molokai" was lying, he saw indications of the recent removal of a heavy object from the beach. (Mrs. Waiboud testified that she had noticed that a coral stone used for tying boats to was missing.) The sheriff also testified that at the same time he noticed from two freshly cut rope ends that a section of rope had been removed from the sampan.

Each of the defendants set up an alibi in defense and denied practically all of the testimony given by the prosecution. One witness for the defense, Leo Poaha, testified that he was a member of the fishing gang and was out with the other fishers on the night of March 14, 1916, but that neither the defendants nor Waiboud were there. On cross-examination the witness admitted that he had on several occasions told the sheriff and detective that he was not out fishing that night but that he had been at Pukoo, but said that he had lied to the sheriff and detective.

The defendant Waldemar Duvauchelle testified that, on the night in question, he was not at Keawanui, but that he stayed all that night at home at the school cottage with his wife; that he was not living with his father at that time; that because of his marriage on January 16, 1916, his father had taken offense and had ordered

him to leave the home, and that the father and his son were not on speaking terms from that time to about a year and a half later when the witness' first child was born; that since his marriage up to March 14, he had never been absent a single night from his wife and home at the school cottage. On cross-examination he stated that during the month of March, 1916, he worked on the county telephone line under Jim Crane, and that his father as district overseer was not in charge of the telephone work; that during 1916 he did no other county work; that he first heard of Waiboud's disappearance about nine o'clock Wednesday morning; that he remained at home all of that day; that the next day about noon he went to Keawanui where he was asked to go searching for the lost man, which he did; that the next day he went out with the road gang searching; that he did not know where the road gang had been working that week and that he did no road work in the month of March. His wife testified that her husband and his father were not on speaking terms at that time and that her husband was at home on the night of Waiboud's disappearance and that her husband did no road work or other work for the county during 1916 except the work on the telephone line.

The defendant John Duvauchelle testified that at the time in question he lived at Pukoo with his father; that he first heard of the disappearance of Waiboud on the morning of Wednesday the 15th; that he was told this by some of the road men; that on the previous night he was at home all night and that the mail carrier and he slept in the same room; that he arose about half-past six Wednesday morning and was not at Keawanui pond Tuesday night or Wednesday morning. On cross-examination this defendant testified that he did no road work and that he had never worked in Paia Naki's road gang;

that he stayed at home all day on Wednesday and that on Thursday and Friday he joined in the search for Waiboud. The witness also said that he and his father knew that Waiboud watched the fish pond at night.

The defendant Edward Duvauchelle testified that he was born at Pukoo and had lived there for the last eighteen or nineteen years; that he was in the fishing business until July 1915, when he was appointed district overseer upon which his boats and nets were taken over by Suga and Iona on an agreement for a division of the proceeds; there were two skiffs and the sampan "Annie Dee;" he was also postmaster, first for a four-year term and again for two years and that he still held that position; Waiboud got his mail and shipped his fish at Pukoo; he knew Waiboud well and was on good terms with him and they never had had any trouble; he last saw Waiboud three or four days before his disappearance; he first heard of the disappearance on Wednesday from a Chinese named Ung Dee; on the night of March 14 he was at home all night and that it was blowing hard and raining; the mail carrier spent the night at the home of this defendant and defendant and the mail carrier made the mail up that night, after which they went to bed; that he delivered and received mails to and from the steamers and attended to the receipting for the same, it being his duty and responsibility; the mail carrier woke him up about three or four the next morning at which time he and the mail carrier carried the mail to the wharf; there were more people on the wharf than usual that morning, people intending to take the steamer for Maui to attend a church convention; he waited on the wharf for the steamer (the Mikahala) until six o'clock but the steamer did not come. At seven that morning he started on horseback to his work towards Kamalo; he was not at Keawanui or that vicinity at any

time on the night of March 14-15 nor was he in that vicinity early Wednesday morning; that on Thursday and Friday he joined in the search for Waiboud. On cross-examination this defendant testified that his son John had no occupation other than working for his father during 1916, and that John never did any road work; that after Waldemar got married defendant gave Jim Crane permission to employ Waldemar on telephone work; that Waldemar never did any road work; that the postmaster had to be at the wharf to count the mail bags and sign for them and take the purser's receipt for outgoing mail; the mail carrier would check the bags and either he or defendant would sign the receipt but he, the defendant, was responsible and this necessitated his presence there and for this reason he always went. Paia Naki was the luna of the Mapulehu road gang under defendant's supervision but defendant did not remember speaking to Naki on that Wednesday morning; that he did not ask Naki to put his sons John and Waldemar to work in the road gang that morning; John remained at home that morning; that he had no recollection of seeing his son Waldemar that morning and that after Waldemar's marriage this defendant did not speak to Waldemar for about a year and a half.

Mrs. Annie Duvauchelle, wife of the defendant Edward Duvauchelle and stepmother of the other defendants, testified that on the day before Waiboud's disappearance her husband came home at four in the afternoon, stayed home all night until early next morning when he went with the mail carrier to the post office; that she did not see her husband again until about seven o'clock when he returned from the wharf with the mail carrier; that John Duvauchelle and the mail carrier occupied the same room that night; she also testified

to the fact that her husband and Waldemar were not on good terms.

Paahao, the mail carrier, testified that on Tuesday, March 14, 1916, he arrived at Pukoo about six o'clock p. m., had dinner at Duvauchelle's with the family and Jim Crane; after supper he helped Edward Duvauchelle make up the mail, after which he went to bed, sleeping in the same bed with John who had retired earlier. He got up between three and four next morning and he and Edward Duvauchelle took the mail down to the wharf; the steamer did not come in on account of rough weather; they stayed at the wharf until about six o'clock; the relations between Waldermar and his father were not good and Waldemar did not live at the home of his father but with his wife at Kaluaaha schoolhouse.

James Crane testified that he was living at Duvauchelle's at the time in question; that he had supper there on the evening of March 14; that Edward Duvauchelle was at home that evening; that he saw Edward Duvauchelle and the mail carrier bring the mail to the wharf about three o'clock; it was a stormy night; that Waldemar and his father were not on speaking terms for about eight months or more.

Aukai Kaelepa, Robert Kawai and Kiliona Kaneakua testified to being on the wharf early Wednesday morning and that they saw Edward Duvauchelle and the mail carrier there.

Crane and Aukai testified also that Jim Opu was at the wharf that morning although Opu himself and four other witnesses had testified that he was over at Kalaeloa.

In rebuttal the prosecution called H. H. Ewaliko, Dan Haoli, A. K. Laumauna and S. Keakamai, who testified that they were at the wharf that morning and that Edward Duvauchelle was not there.

Henry Kaipo and Charles Jones, pursers on the Inter-Island boats on the Molokai run from 1913 to 1917, testified as to the receipt and delivery of mails at Pukoo, and stated that it was the rule to require the postmaster's receipt for mail if he was on the wharf, but that at Pukoo they generally took the receipt of the mail carrier because Edward Duvauchelle was seldom there.

A. M. Harris and Charles Kaanoi testified that on the road at Ualapue on August 18, 1923, Jim Crane told them that he was not at Pukoo wharf on the morning that Waiboud disappeared.

Charles Wilcox, auditor of the County of Maui, identified certain payrolls admitted in evidence as exhibits, being vouchers for payment of payrolls approved by Edward Duvauchelle as district overseer. Only one payroll, dated February 29, 1916, covered work done on the Molokai telephone. The others show payments approved by Edward Duvauchelle for other work done by Waldemar during the period in which the defendants as well as other witnesses had testified that Waldemar and his father were not on speaking terms. One of these payrolls, Exhibit D, shows that in the month of March 1916, John Duvauchelle was paid for three days' road work and Waldemar for two days' work.

Paia Naki testified that he had been blind for four years; that during the year 1916 he was a road luna under Edward Duvauchelle; that on the day that Waiboud disappeared he and his gang were working on the road at Pukoo; that between seven and eight o'clock that Wednesday morning Edward Duvauchelle came and asked him to put his two sons John and Waldemar to work with the road gang; that he felt queer because the boys had theretofore declined such work, but that he put them to work; that the two boys came over

from their father's house and immediately started in to work. A labor time-book kept at that time by the witness was put in evidence, containing entries indicating that John and Waldemar had been put to work as testified to by the witness. These entries show that John worked in the road gang on March 15, 16 and 17, and Waldemar on March 15 and 16, 1916.

In sur-rebuttal Edward Duvauchelle testified that he had had no such conversation as Naki had testified to and that his sons' names were put on the payroll in order that they should be compensated for the work done in searching for Waiboud. The testimony showed that the road laborers went out searching only one day, and John Duvauchelle had testified that he got no pay for that. On cross-examination Edward Duvauchelle was unable to name any other person than his two sons who had been paid for joining in the search for Waiboud.

As already stated, one of the witnesses for the prosecution testified that on the return of the three defendants and Suga to the beach, after the alleged assault, tying and conveyance of Waiboud to sea, Duvauchelle, Senior, said: "It was good that the chinaman was killed." There is considerable conflict in the authorities as to whether the *corpus delicti* may be established by the extrajudicial confession of a defendant unsupported by any other evidence, but in the present case we are not required to express an opinion as to this, for it cannot be said that this extrajudicial statement made by one of the defendants is unsupported by other evidence. "Extrajudicial admissions, declarations, or confessions of accused are not of themselves sufficient to establish the corpus delicti, although they may be considered in connection with other independent evidence in determining whether the corpus delicti is sufficiently proved; and deficiencies in the state's evidence in refer-

ence to the corpus delicti may be supplied by accused, testifying in his own behalf." 16 C. J., pp. 771, 772. "According to the elementary rule of evidence in criminal cases, the corpus delicti must be established beyond a reasonable doubt, although it has been said that there is no invariable rule as to the quantity of proof necessary to establish the corpus delicti, and that each case must depend in a measure on its own particular circumstances." 16 C. J., p. 773.

In *State* v. *Lamb,* 28 Mo. 218, the body of the woman alleged to have been murdered and cast into the river was never found, and it was contended that, except for the confession of the prisoner, there was no proof that the woman was dead, that she came to her death by any crime, or that she was killed in the manner charged in the indictment; in other words, the contention was that the *corpus delicti* had not been proved *aliunde* the confession, which, it was urged, was essential. In repudiating this contention, the court said at page 231: "But it is maintained that where the evidence of the *corpus delicti* is to be found only in the confession, and there is no positive testimony besides the confession that the crime has been committed, that a prisoner can not be convicted on his uncorroborated confession alone. We do not deem it necessary to enter into an examination of the abstract question whether, when the only evidence of the fact that a crime has been committed is contained in the confession of the party charged with having committed the crime, he can be convicted on such a confession alone without any extrinsic corroborative circumstances. We term the question abstract, because such a case will rarely happen. The case of the prisoner is not of this class. Although the dead body has not been found, and although no witness swore that he saw the perpetration of the murder,

yet the circumstances extrinsic to the confession, and established by other evidence, are so strong that they cannot fail to satisfy any unbiased mind that the accused is guilty of the crime of which he has been convicted. We consider the true rule, as deduced from the current of authorities, to be, that an extra-judicial confession with extrinsic circumstantial evidence satisfying the minds of a jury beyond a reasonable doubt that the crime has been committed, will warrant a conviction, although the dead body has not been discovered and seen, so that its existence and identity can be testified to by an eye-witness. We do not deem it necessary to enter into an examination of all the authorities on this point. The rule as stated commends itself for its suitableness to the exigencies of all cases, and is in strict harmony with the principles on which all jury trials proceed. When the guilt or innocence of a prisoner is the subject of determination for a jury, they are the only competent judges of the sufficiency of the evidence to produce a conviction on their minds. When the evidence is legal and they are satisfied with its sufficiency, it is not for courts on fancied possibilities to disturb their verdicts."

In *People* v. *Alviso,* 55 Cal. 230, 233, the defendants urged that a conviction could not be sustained because the body of the person alleged to have been murdered had not been discovered, and an essential fact in any charge of murder, namely, death, had not been discovered. Held, citing Wharton on Homicide, Sec. 637, that the *corpus delicti* may be proved circumstantially or inferentially. See also *Leftridge* v. *United States,* 97 S. W. (Ind. Ter.) 1018, which holds that the *corpus delicti* may be proved by circumstantial evidence, citing numerous cases in which this rule has been enunciated.

The statement by the defendant Edward Duvauchelle

that it was good that the chinaman was dead was clearly a part of the *res gestae* and as such therefore admissible. " 'The *res gestae,*' Wharton said, 'may be, therefore, defined as those circumstances which are the undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. They may consist of speeches of any one concerned, whether participant or bystander,' " quoted by the court in *St. Clair* v. *United States,* 154 U. S. 134, 149. In this case one of the errors assigned was the admission in evidence of a statement of the captain of the vessel that for several days before and after the night the man alleged to have been murdered disappeared, he saw no vessels. The court said, page 152: "This evidence was clearly competent. It bore upon the inquiry whether Fitzgerald was actually drowned or was alive. If vessels were shown to have been in sight, at or near the time of the alleged murder, the jury might have been left in doubt as to whether he was rescued after being thrown into the sea. Direct and positive evidence as to the *corpus delicti* was not required. Wills on Cir. Ev. 179." The court also cited with approval the rule laid down in *Hindmarsh's* case, 2 Leach, C. C., 3d ed. 648, saying at page 152: "The counsel for the prisoner in that case contended that he should be acquitted on the evidence, because it was not proved that the captain, the person alleged to have been murdered, was dead, and 'as there were many ships and vessels near the place where the transaction was alleged to have taken place, the probability was that he was taken up by some of them and was then alive.' It was left to the jury to say whether, upon the evidence, the deceased was not killed before his body was cast into the sea."

The fact as to whether Waiboud is dead does not depend for proof alone upon the extrajudicial statement of Edward Duvauchelle. On the contrary, there is ample evidence independent of such extrajudicial statement from which the jury was warranted in finding that Waiboud was in fact dead, and that he had come to his death in the manner alleged in the indictment, indeed, to an unbiased mind, it would seem that from all the evidence a finding that Waiboud was not dead would be a most astonishing flight into the realms of fiction. It is contended by the defense that, even conceding that Waiboud was assaulted by defendants at the sea beach, bound by ropes, carried out to sea and cast therein, there is nothing in the evidence to exclude the possibility of his not being dead, for he may have been rescued by a passing ship or sampan. It is also urged that there is nothing in the evidence to negative the possibility of Waiboud's having clandestinely departed from his home and family and that, for all that appears to the contrary, he may still be in the land of the living. There is no evidence whatever that any vessel or boat of any sort was at or near the locality at or near that time. There is abundant evidence tending to prove that Waiboud was in fact assaulted, tied up and taken out to deep water, his assailants returning shortly without him, and the assertion that, under such circumstances, he may have been providentially rescued by some passing vessel is, to say the least, most fanciful. Further, if such indeed had been the case, the fact that he has never returned nor informed his friends and relatives of his whereabouts, would seem to absolutely refute such an unlikely possibility. And the probability of the lost man's having intentionally deserted his home is as fanciful and conjectural as the notion of his having been in some

mysterious way rescued. From all that appears to the contrary from the evidence, Waiboud was living contentedly at home with his family, and no reason for his desertion has been revealed or hinted at in the evidence. Furthermore, such a desertion without its discovery would perhaps have been even more unlikely than the theory of a rescue by a passing ship. The censuses of both the years 1910 and 1920 give the population of Molokai (excluding the leper settlement which is separated from the rest of the island by practically insurmountable precipices) as slightly more than one thousand people. It is common knowledge that at the time under discussion ships touching at Molokai were few and the departure of a well-known resident from that small community could not readily have occurred without that fact being generally known.

From all the evidence in the case we are entirely satisfied that the jury was warranted in finding beyond a reasonable doubt that Waiboud was dead and that his death had come about through the criminal agency of the defendants. This exception is overruled.

Under exceptions 5 and 7 it is contended that the trial court erred in permitting the witnesses Merriam and Conradt to recount conversations had between themselves and Waiboud, in the absence of the defendants.

The witness Merriam having, on cross-examination, testified that the fishing business carried on between himself and Waiboud had not been successful, was asked, on redirect, if there had been anything in Waiboud's reports to Merriam to indicate the reason for the lack of success of the business. The witness answered, "He made certain verbal reports when he came to Honolulu and other reports by communication, and that he considered that the depletion of the stock of fish in the pond was due, in a large part, to the robbery

of the pond, and further indicated who he thought the culprits were, and the ones he said - - -'" (the witness was not permitted to go further).

C. C. Conradt was permitted to testify in reference to a conversation had between himself and Waiboud shortly before his disappearance: "Well, he came to see me Tuesday afternoon and while talking there he dropped out that his fish pond had been raided most every day."

The contention of the defense is that these statements by Merriam and Conradt were hearsay and that the admission thereof constitutes reversible error. Whether Waiboud was at the place at which it was alleged the murder was committed was clearly relevant, and evidence tending to prove that fact was, therefore, admissible. In the absence of any evidence in that respect, counsel for the defendants doubtless would have argued, and they would have been justified in so arguing, that it was highly improbable that Waiboud should have been there at such an unseasonable hour. The statements by Merriam and Conradt were obviously not offered in evidence, nor would they have been admissible, for the purpose of proving that the defendants had in fact raided the fish pond. The fact sought to be proved by this testimony, and such fact was relevant to the issue, was that Waiboud had made such statements— not that the statements were true. Such statements tended to indicate a frame of mind or intention on the part of Waiboud which made it probable he would be on guard for marauders of his fish pond, which guarding would, in all probability, be conducted in the vicinity of the pond and near the scene of the alleged murder.

In *State* v. *Long,* 123 Atl. (Del.) 350, 351, it was held that declarations of deceased as to where he was going that night, though not a part of the *res gestae,*

were admissible to show his purpose or intention at that time. In discussing the admissibility of such statements the court said: "Such declarations are also admitted in some cases on the ground that they are verbal acts. State v. Hayward, supra. If, however, the doing of an act is material, then the existence of a design or plan to do that specific act is relevant to show that the act was probably done as planned (1 Wigmore on Ev., Sec. 192; Greenleaf on Ev., Sec. 126a); and, considering the plan or design as a condition of mind, a person's own statements of a present existing state of mind when made in a natural manner, under circumstances dispelling suspicion, and containing no suggestion of sinister motives, only reflect the mental state, and are, therefore, competent to prove the condition of the mind when made; or, in other words, what such person's purpose or intention then was. * * * The purpose of the question is not to show that the deceased was at some time at a particular place with a particular person because he said he was going there —and it clearly would not be admissible on that ground— but to show his purpose or intention at the time he made such statement as a circumstance tending to show that he did as he planned or intended to do."

In Stogsdill v. State, 216 Pac. (Okl.) 681, it was held that "Explanatory circumstances and declarations connected with the commission of a homicide, which have a tendency to shed light on the motives of the parties, are admissible in evidence, including antecedent declarations made by the deceased and those acting in concert with him, where they form some link in the chain of circumstances explanatory of their motives or other vital issues involved."

In upholding the admissibility of testimony of a witness to the effect that a report had been made by

the deceased to the witness in a homicide case, the court in *State* v. *Coll,* 83 So. (La.) 844, 846, said: "The fact of these reports having been made was not irrelevant, since it was what led to the killing, and it was not hearsay, since it was an independent fact which the witness was acquainted with from his own observation. If the accused had been on trial for the irregularities in question, any statement made by Middleton" (the deceased) "to the witness with regard to these irregularities would have been hearsay; but the purpose of the question on the present trial was to show intent by proving that the reports were made, and that the fact of their having been made was communicated to the accused by the manager, and caused him to become angry with the deceased. Facts going to show intent can certainly be testified to."

In *Commonwealth* v. *Phelps,* 209 Mass. 396, where a peace officer was killed by a person he was arresting without a warrant for the commission of a felony, the exception was that the court had erroneously permitted a witness for the prosecution to testify that the deceased peace officer, while on his way to the scene of arrest, had said, not in the presence of the defendant: "Si" (the defendant) "is at it again." The court said, page 411: "This was admissible to prove that Haskins did suspect that the defendant had committed a crime. The judge in his charge instructed the jury that it could not be used by them to draw any inferences of the fact that any act had been done by the defendant but only to show the state of mind of Haskins at the time, with a view to any light it might throw upon his action in connection with his proceedings in making the arrest."

In *Bates* v. *Commonwealth,* 225 S. W. (Ky.) 1085, a witness was permitted to testify that on the Friday

preceding the death of the deceased, he passed him
going in the direction of the home of the accused with
a jug in his hand and that deceased made inquiry as
to the whereabouts of the accused.    Another witness,
daughter of the deceased, was permitted to testify that,
upon his leaving his home on that afternoon, he said
that he was going to see the accused to collect a sum
of money which accused owed him, and that he took
with him a jug in which he was intending to procure
whisky.    The appellate court held this testimony ad-
missible saying at page 1091:  "It was both relevant
and competent to prove the meeting of the accused
and deceased on that afternoon, and that he made
inquiry of the whereabouts of the accused as explana-
tory of his purpose while in the act of going, and that
he had a jug with him might be as properly proven as
that he was on horseback; but, it is objected that the
proof of the declaration that he intended to procure
whisky was not competent because hearsay and irrele-
vant, and was intended to indicate to the jury that the
accused was engaged in the illicit sale of whisky, and
thereby created a prejudice against him in the minds
of the jury.    The declaration by deceased of his inten-
tion to procure whisky in the jug was not competent
as evidence, as it shed no light upon the issues to be
decided and no other fact proven in the record made it
relevant, and, if the testimony had the effect only of
proving that the accused was engaged in selling liquor
contrary to law, it would have been prejudicial; but
the error was harmless, as the deceased, according to
the declarations proven, did not intimate that he pro-
posed to procure whisky from the accused, but was
intending to obtain money which he owed him, and
there is nowhere intimated in the entire record that
the accused was engaged in the traffic of whisky.    If

the declaration of deceased that he was going to see the accused and his inquiry for him upon the road was incompetent as hearsay, the proof of them was likewise harmless, since other evidence as well as that given by the accused himself proved that deceased did visit him upon that occasion, as well as the object of the interview, and neither of these facts is disputed."

In *Williams* v. *Commonwealth,* 104 S. E. (Va.) 853, a prosecution for murder of a plain clothes police officer involving the issue of whether defendant had shot deceased in self-defense, not knowing him to have been a police officer, the testimony of the chief of police that he had told deceased and other policemen that defendant was in the city and was wanted for murder committed in another state was held admissible. To the contention of the defense that such evidence was hearsay and inadmissible, the court said at page 857: "We are of opinion that the trial court committed no error in the action in question. The guilt or innocence of the accused of the alleged crimes in South Carolina was not involved in the case at bar. But the questions of fact which were material, and which were in issue in the case, were whether the accused was being sought to be arrested by the police in Lynchburg on the charges of other crimes, and whether the accused, before he did the shooting for which he was being tried, feared or apprehended arrest, and had determined to kill any one attempting his arrest, if necessary in order to prevent it."

In *State* v. *Farnam,* 161 Pac. (Ore.) 417, testimony of several witnesses as to statements made to them by the deceased was held admissible, the court citing numerous cases in support of its ruling.

From the authorities cited, as well as upon principle, we are convinced that the evidence of Merriam

and Conradt was not hearsay and was properly admitted; furthermore, even if these statements might be considered hearsay, they were harmless for it appears by other sufficient evidence that Waiboud knew and had stated to others that his fish pond was being raided, and that for that reason it was his custom nightly to guard the same and go to the place where he is alleged to have been murdered. See *Gilbert* v. *State*, 215 S. W. (Tex.) 106, also *Bates* v. *Commonwealth, supra.* This exception is overruled.

Another contention of the defendants is that the court erred in giving to the jury prosecution's instruction No. 1 which reads as follows:

"These defendants, Edward K. Duvauchelle, Waldemar Duvauchelle and John Duvauchelle, have been indicted and charged with the crime of murder in the first degree by killing one Wong Waiboud, feloniously, willfully and with deliberate, premeditated malice aforethought, and without authority, justification or extenuation by law, at Keawanui, on the Island of Molokai, in the County of Maui, on the 15th day of March, 1916. The second count in the indictment sets forth the means alleged to have been employed by the defendants in the commission of the crime charged, and there is evidence before you in this case tending to prove the same, as follows: That at the time and place mentioned, the defendants made an assault on Waiboud, bound him with rope, placed him in a boat, and took him so bound and cast and threw him from the boat into the waters of Keawanui Bay, and that by reason of such binding, casting and throwing into said water by the defendants, the said Waiboud then and there died."

The portion of the instruction objected to is: "And there is evidence before you in this case tending to prove the same, as follows: That at the time and place mentioned, the defendants made an assault on Waiboud, bound him with rope, placed him in a boat, and took him so bound and cast and threw him from the boat into

the waters of Keawanui Bay, and that by reason of such binding, casting and throwing into said water by the defendants, the said Waiboud then and there died." It is urged that the statement of the trial court that there was evidence tending to prove certain facts was an invasion of the province of the jury, as the exclusive judge of the facts, and was, therefore, in violation of section 2426, R. L. 1925, which prescribes: "The jury shall in all cases be the exclusive judges of the facts in suits tried before them, and the judge presiding at any jury trial (hereafter in this chapter named the court), shall in no case comment upon the character, quality, strength, weakness or credibility of any evidence submitted, or upon the character, attitude, appearance, motive or reliability of any witness sworn in a cause; provided, however, that nothing herein shall be construed to prohibit the court from charging the jury whether there is or is not evidence (indicating the evidence), tending to establish or to rebut any specific fact involved in the cause, nor shall it be construed to prohibit the setting aside of a verdict rendered by such jury, in a proper case, as being against the weight of evidence, and the granting of a new trial therein."

We should first observe that, in regard to the contention that the trial court, in giving prosecution's instruction No. 1, violated the provisions of the above statute, the defendants are not entitled to have the same considered here, for from the record it does not appear that the defendants objected to the giving of said instruction. In the bill of exceptions allowed by the trial court it is stated that "defendants duly excepted to the giving of this instruction by the court (Tr. 1076)." An examination of the transcript, however, at page 1076 or at any other page thereof, fails to show that

the defendants excepted to the instruction in question, but on the other hand it clearly appears from the transcript that no such exception was taken. Page 1076 of the transcript shows that after the court had instructed the jury, counsel for defendants, in objecting to the instructions given and refused, addressed the court as follows: "If the court please—the defendants except to the giving of prosecution's instructions Nos. 6, 9, 10, 12, 14, and 15; and further except to the refusal of the court to give, as requested, defendants' instructions Nos. 1, 5, 6 and 12B; and to the refusal of the court to give defendants' instructions Nos. 3, 4, 7, 8, 10, 11, 11A, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 26, 26A and 27 as requested by defendants. In view of the fact that I can't see the numbers of your honor's charges, at this time we except to the giving of each and every instruction given by the court of its own volition. The Court: Exceptions may be noted."

The minutes of the clerk also show that no exception was taken by defendants to prosecution's instruction No. 1. It is true that the bill of exceptions allowed by the trial court indicates that the exception contended for was preserved, but this is negatived by the transcript made at the time, and in the case of a discrepancy between the bill of exceptions and the transcript, and more particularly when the transcript conforms to the clerk's minutes, such discrepancy should be resolved in favor of the transcript. Such was the holding of this court in *Territory* v. *Masagi*, 16 Haw. 196, 204.

In view, however, of the grave character of the charges against these defendants, we deem it advisable to consider whether in fact the instruction complained of constituted error for which a reversal of the verdict should be granted.

In giving the instruction complained of it is not sug-
gested, nor can it be, that the court in any manner
commented upon the character, quality, strength, weak-
ness or credibility of the evidence in the case. The
sole complaint is that the court should not have told
the jury that there was evidence in the case tending
to prove certain facts alleged in the indictment. In
the case of *Territory v. Dengiro,* 15 Haw. 64, this court
set aside a conviction because the trial court gave to
the jury in its charge a statement of the evidence which
the court termed "a condensed synopsis" of the evidence
of the prosecution. No reference was made by the
court in that case to the testimony of the defendant,
nor was the jury instructed in this or any other part
of the charge that it was the exclusive judge of the
facts. In that case the shooting was admitted by the
defendant whose defense was that the killing was in
self-defense and justifiable. There were but two eye-
witnesses to the shooting, the mother and the defendant.
The killing being admitted the real issue in the case
was whether or not there was any justification for such
killing. Notwithstanding this, this issue was entirely
ignored by the trial court which, as already observed,
without reminding the jury that under the law it was
the exclusive judge of the facts, gave undue prominence
to the evidence for the prosecution overlooking entirely
the real issue in the case.

In the present case it cannot be said that the trial
court gave undue prominence to the evidence on behalf
of the prosecution or that it ignored the issues in-
volved. After giving the instruction complained of
the court instructed the jury that the indictment in
any case is but a mere accusation or charge and not
evidence against the defendants, and that no juror in
this case should permit himself to be in any measure

influenced against the defendants because of the fact that they had been indicted. The court, furthermore, in an instruction carefully prepared by the defense charged the jury that it was the exclusive judge of the credibility of all the witnesses, of the weight of the evidence and of all the facts in the case. The jury was reminded that it was its exclusive right to determine from the appearance of the witnesses, their manner of testifying, their apparent candor or frankness, or lack thereof, which witness or witnesses were more worthy of credit, and that they, the jurors, from the facts which they might find to have been proven by the evidence, were authorized to draw any and all such reasonable inferences as those facts, in the sound judgment of the jury, might justify or require to be drawn. The jury was admonished that its verdict must be based solely upon these facts or inferences and that it was its duty to disregard everything that it might have read about the case in the newspapers or heard outside of the court. The jury was also properly instructed that the defendants were presumed to be innocent of the offense charged; that their plea of not guilty put in issue every material allegation of the indictment and that they could not rightly be convicted unless the prosecution, by the evidence, had overcome the presumption of defendants' innocence and had made out every material allegation of the indictment to the satisfaction of the jury beyond all reasonable doubt; that clear and satisfactory proof of the guilt of defendants was required and that no mere weight or preponderance of testimony would be sufficient to warrant a conviction of defendants unless it be so strong as to remove from the minds of the jury all reasonable doubt of the defendants' guilt. In an instruction, requested by the defense, the jury was charged

in regard to the defense of alibi which constituted defendants' main defense. In regard to such a defense the jury was instructed that it was not necessary for the defendants to prove an alibi beyond a reasonable doubt nor by a preponderance of the testimony but that if, after consideration of all the facts and circumstances in evidence, the jury entertained a reasonable doubt as to whether or not the defendants were present at the time and place of the commission of the offense alleged in the indictment ("if such offense has been committed by any one") it would be the duty of the jury to give defendants the benefit of such doubt and acquit them.

The proviso attached to section 2426, R. L. 1925, prescribes that nothing in this statute "shall be construed to prohibit the court from charging the jury whether there is or is not evidence (indicating the evidence), tending to establish or to rebut any specific fact involved in the cause." In other words, under this proviso, the court may, in a proper case and manner, charge the jury as to whether there is or is not evidence tending to establish facts involved in the cause. In so doing the court is required to indicate what that evidence is, but, as this court has held in *Republic* v. *Ah Ping,* 10 Haw. 459, 461, in indicating the evidence referred to, the trial court is not bound in all cases to review the whole evidence because it has specifically referred to one portion. We cannot agree with the contention of the defense that there was no evidence tending to prove "that at the time and place mentioned, the defendants made an assault on Waiboud, bound him with rope, placed him in a boat, and took him so bound and cast and threw him from the boat into the waters of Keawanui Bay, and that by reason of such binding, casting and throwing into said water

by the defendants the said Waiboud then and there died." From what we have said in regard to the *corpus delicti* it appears that there is abundant evidence tending to show these facts and the trial court, in indicating as it did the presence of such evidence, did not violate the provisions of the statute nor invade the province of the jury.

We have carefully examined the record and all the exceptions and are convinced that defendants have had a fair and impartial trial and that the jury was warranted from all the evidence in arriving at the conclusion of the guilt of the defendants.

The exceptions are overruled.

*A. G. M. Robertson* (*Robertson & Castle* and *H. R. Hewitt*, First Deputy Attorney General, on the briefs) for the Territory.

*H. L. Wrenn* (*A. E. Jenkins, Huber & Kemp* and *J. L. Coke* with him on the briefs) for defendants.

### CONCURRING OPINION OF PETERS, C. J.

No exception was alleged by the defendants upon the trial to the giving by the court of prosecution's requested instruction No. 1. Under the circumstances if error was committed it was waived and is not subject to review by this court. (*Brown* v. *Bannister,* 14 Haw. 34, 37.) I prefer to base my concurrence in overruling exception No. 93 on this ground. With this reservation I agree with all that is said in the foregoing opinion and join in the conclusion that the exceptions be overruled.